UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| CINDY M. ALEJANDRE; and DAVID GONZALEZ II as Co-Successors-in-Interest to Decedent David Gonzalez III, | No. 2:19-cv-00233-WBS-KJN |
| Plaintiffs, | MEMORANDUM AND ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MOTION TO SEAL |
| v. | |
| COUNTY OF SAN JOAQUIN, a municipal corporation; STEVEN BAXTER, individually and in his capacity as a Sheriff's deputy for the County of San Joaquin Sherriff's Department; MATTHEW FELBER, individually and in his capacity as a Sheriff's deputy for the County of San Joaquin Sheriff's Department; CHUE VANG, individually and in his capacity as a Sheriff's deputy for the County of San Joaquin Sherriff's Department; JASON ROHDENBURG, individually and in his capacity as a Sheriff's deputy for the County of San Joaquin Sherriff's Department; BARBARA GOEMAN and DOES 1-25, inclusive, individually and in their official capacity as Sheriff's Deputies for the County of San Joaquin Sheriff's Department, | |
| Defendants. | |

----oo0oo----

1

1    Plaintiffs Cindy Alejandre and David Gonzalez II

2    ("plaintiffs") brought this action as successors-in-interest to

3    their son, decedent David Gonzalez III ("Gonzalez"), against the

4    County of San Joaquin ("County"); San Joaquin County Sheriff's

5    Deputies Steven Baxter, Matthew Felber, Chue Vang, and Jason

6    Rohdenburg; and Nurse Barbara Goeman, seeking damages under 42

7    U.S.C. § 1983 for denial of medical care and failure to summon

8    medical care, violation of plaintiffs' Fourteenth Amendment

9    rights to a familial relationship with Gonzalez, and excessive

10   force, in addition to state law claims of failure to summon

11   medical care, wrongful death--negligence, violation of the Tom

12   Bane Civil Rights Act, battery, and intentional infliction of

13   emotional distress.  (See generally Third Am. Compl. ("TAC")

14   (Docket No. 37).)

15       Before the court are defendants' Motion for Summary

16   Judgment (Defs.' Mot. for Summ. J.) (Docket No. 66-1.), and

17   defendants' Motion to Seal Exhibit 19 to their Compendium of

18   Evidence.  (Defs.' Mot. to Seal)(Docket No. 67.)

19   I.   Factual and Procedural Background

20       Decedent David Gonzalez III ("Gonzalez") was arrested

21   and taken into custody at the San Joaquin County Jail ("Jail") on

22   June 22, 2018.  (See Defs.' Statement of Undisputed Facts

23   ("Defs.' SUF") No. 1, Docket No. 66-3).)  Deputy Jason Rohdenburg

24   was assigned to the Jail's Classification Unit on that date and

25   conducted Gonzalez's classification interview, which included a

26   diagnostic process of identifying Gonzalez's physical, emotional,

27   and security needs for his detainment.  (See id. at Nos. 1-2.)

28   During the classification interview, Gonzalez indicated to Deputy

Rohdenburg that he was withdrawing from opiates.  (See id. at No. 3.)  Deputy Rohdenburg notified Jail medical personnel that Gonzalez was withdrawing from opiates, and Gonzalez was medically evaluated by defendant Nurse Barbara Goeman.  (See id. at No. 4.)

During Nurse Goeman's intake medical examination, Gonzalez reported that he was a regular heroin user and was experiencing withdrawal symptoms.  (See id. at No. 17.) Gonzalez's vital signs were normal, and his physical examination revealed piloerection (goose bumps), tremors, and rhinorrhea (runny nose).  (See id.)  Gonzalez reported experiencing anxiety, nausea, yawning, diarrhea, insomnia, arthralgia (joint pain), chills, and cramping.  (See Decl. of DeWitt Lacy in Opp'n to Mot. for Summ. J. at Ex. B ("Lacy Decl.") (Docket No. 70-4).) Gonzalez was speaking normally and had a steady gait.  (See Defs.' SUF at No. 17.)

Nurse Goeman made diagnoses of heroin abuse and withdrawal and started Gonzalez on the Jail's Opiate Withdrawal Protocol, which included provision of Phenergan (promethazine), Vistaril (hydroxyzine), Donnatal, Benadryl (dipenhydramine), Gatorade, and monitoring. (See id.)  At no time during Gonzalez's intake evaluation did he report any heart abnormalities or unusual medical conditions, aside from his withdrawal from heroin.  (See id.)  Nurse Goeman then medically cleared Gonzalez for incarceration.  (See id. at No. 4.)  Gonzalez was placed in "general population" housing, and not in the Jail's medical housing, because Nurse Goeman determined he was "hemodynamically stable and not in acute withdrawal" requiring continuous nursing and medical care.  (See id. at No. 21.)

1     On June 25, 2018, Gonzalez was seen by another nurse
2  because he reported that he had been vomiting since the day
3  before and was unable to keep down food.  (See Lacy Decl. at Ex.
4  NN.)  He was given an injection of Phernergan to resolve his
5  vomiting symptoms.  (See Defs.' SUF at No. 22.)  At approximately
6  midnight on June 26, 2018, Gonzalez pressed his cell's medical
7  emergency call button and Deputy Chue Vang responded.  (See id.
8  at No. 9.)  Gonzalez told Deputy Vang that he was in pain and
9  going through withdrawal.  (See id. at No. 10.)  Deputy Vang
10 called Nurse Goeman and escorted Gonzalez from his cell to the
11 medical examination room where Nurse Goeman evaluated him.  (See
12 id. at No. 11.)  Gonzalez was alert, oriented, able to
13 communicate his needs and concerns, and had a strong and steady
14 gait.  (See id. at No. 24.)  He reported that he was "eating ok."
15 (See id.)  Gonzalez complained of hand cramping and was given
16 Motrin.  (See Lacy Decl. at Ex. NN.)  Nurse Goeman cleared
17 Gonzalez to remain in his general population housing unit and
18 noted that he did not want to be on bed rest and wanted to go to
19 his court appearance.  (See Mot. for Summ. J. at Ex. 5.)

20     Defendant Deputy Steven Baxter supervised the process
21 of pulling inmates out of their cells to attend their court dates
22 and the transportation of inmates from the Jail to the Stockton
23 Superior Court ("Court") on the morning of June 26, 2018.  (See
24 Defs.' SUF at No. 28.)  Deputy Baxter observed Deputies Carlos
25 Prieto and Jose Hernandez transporting a group of inmates,
26 including Gonzalez, to the transportation lobby for their court

27

28

4

1    appearances.  (See id. at No. 29.)[1]  Deputy Baxter approached and

2    spoke with Gonzalez who told him that his shoulder and stomach

3    hurt.  (See id. at No. 31.)[2]

4            Based on Deputy Baxter's observations of Gonzalez and

5    his conversation with Gonzalez, he believed that Gonzalez was

6    "kicking some sort of narcotic", and resisting going to court for

7    his hearing.  (See id. at No. 35.)  Deputy Baxter consulted Jail

8    management software and saw that Nurse Goeman had cleared

9    Gonzalez for his scheduled court appearance less than 12 hours

10   earlier.  (See id. at No. 36.)  Deputy Baxter, along with Deputy

11   Khankhoune Kannalikham, escorted Gonzalez to the transportation

12   bus to head to court.  (See id. at No. 37.)

13           Defendants contend that Gonzalez was able to walk under

14   his own power but, because he was resisting going to the bus, he

15   _____

16           [1]   Defendants contend that Gonzalez left his housing unit
     without incident but stopped cooperating and began resisting and
17   generally behaving as if he did not want to go to court as he
     approached the transportation lobby, and was then separated from
18   the group of inmates.  (See Defs.' SUF at No. 30.)  Plaintiffs
     contend that Deputy Baxter was aware that Gonzalez did not feel
19   well and that he had to be taken to the transportation lobby by
     Deputies Prieto and Hernandez because he was unable to walk on
20   his own.  (See Pls.' Resp. to Defs.' SUF at No. 30.) (Docket No.
     70-1.)
21

22           [2]   Defendants contend that Gonzalez did not communicate to
     Deputy Baxter that he was sick, having a medical emergency, or
23   that he wanted to go to the hospital.  (See Defs.' SUF at No.
     32.)  Plaintiffs contend that Gonzalez communicated told Deputy
24   Baxter that his stomach and shoulder hurt and that he was in too
     much pain to go to court.  (See Pls.' Resp. to Defs.' SUF at No.
25   32.)  They also state that Gonzalez asked to see a nurse and that
     no nurse was summoned.  (See Lacy Decl. at Ex. L.)  Witnesses
26   stated that Gonzalez was moaning in pain and complaining that he
     did not feel well, needed help, and was dying.  (See Pl.'s Resp.
27   to Defs.' SUF at Nos. 32, 35.)

28
                                    5

was escorted by Deputy Baxter and Deputy Kannalikham.  (See
Defs.' SUF at No. 39.)  When they reached the bus stairwell,
Gonzalez "grabbed a hold of the door, and began pulling himself
away [from the bus] to try and turn past [the deputies] and get
past [them]", but ultimately entered the bus under his own power.
(See id. at No. 39.)[3]

After escorting Gonzalez to the bus, Deputy Baxter
called the Court's control room and spoke with defendant Deputy
Matthew Felber, a bailiff at the Courthouse.  (See id. at Nos.
41, 44.)  Deputy Baxter told Deputy Felber that Gonzalez was
having some medical problems.  (See Mot. for Summ. J. at Ex. 20,
Dep. Tr. of Matthew Felber at 20:21-21:2.)  Deputy Baxter asked
Deputy Felber to "relay a message to Courthouse Sergeant Jason
Wheelen that [Deputy Baxter] had one inmate who was
uncooperative, and that [Deputy Felber] needed to make sure he
had additional deputies [at the Courthouse] ready when the bus
arrive[d]."  (See Defs.' SUF at No. 41.)[4]

Deputy Phillip Hicks was the bus monitor on the

---

[3]   Plaintiffs state that Deputy Baxter and Deputy
Kannalikham carried Gonzalez to the bus. (See Pls.' Resp. to
Defs.' SUF at No. 39.)

[4]   Plaintiffs contend that Deputy Baxter advised Deputy
Felber that Gonzalez was displaying bizarre or erratic behavior
and screaming about wanting to go to the hospital. (See Pls.'
Resp. to Defs.' SUF at No. 41.)  Deputy Baxter also relayed that
he and the other deputies had to carry Gonzalez onto the bus.
(See id.)  Deputy Felber told Deputy Baxter that "if this inmate
is acting that way, we don't want him." (See Lacy Decl. at Ex.
T.)  Deputy Baxter told Deputy Felber that Gonzalez was already
on his way, and if Sergeant Wheelen refused him when he arrived
to court, then the  bus driver would just bring Gonzalez back.
(See id.)

transport bus that took Gonzalez to court. (See Pls.' Resp. to Defs.' SUF at No. 46.)[5]  Five minutes after departing the main section of the Jail, the bus arrived at the south section of the Jail to load more inmates. (See Defs.' SUF at No. 64.)  By this time, Gonzalez was on the floor of the bus, resting against the side wall. (See id.)[6]  After loading the inmates from the south section of the Jail, the bus drove to the Courthouse, a trip of about 25 minutes. (See id. at No. 65.)

At approximately 12:11 P.M., the bus transporting Gonzalez from the Jail to the Courthouse entered the court's "sally port" -- a small garage where buses can come and go from the Court -- and parked.[7] (See id. at No. 45.)  Deputy Felber

---

[5]   Defendants contend that Gonzalez was able to walk to his own seat on the bus, although his arm was held by Deputy Hicks. (See Defs.' SUF at No. 62.)  Plaintiffs dispute that Gonzalez could walk on his own and contend that he was stumbling and falling while walking down the aisle. (See Pls.' Resp. to Defs.' SUF at No. 62.)

[6]   Plaintiffs contend that Gonzalez was not able to sit up under his own power and slid off his seat into the aisle, hitting his head with a loud thump. (See Pls.' Resp. to Defs.' SUF at No. 64.)  Defendants state that Gonzalez was able to stand and return to his own seat at Deputy Hicks' request after he was found on the bus floor, (see Defs.' SUF at No. 64), while plaintiffs contend that Deputy Hicks forcibly picked up Gonzalez and placed him back in the seat. (See Pls.' Resp. to Defs.' SUF at No. 64.)

[7]   Plaintiffs contend that while on route to the courthouse, Deputy Hicks, the bus monitor, heard a loud thump as Gonzalez fell to the floor. (See Pls.' Statement of Additional Material Facts at No. 39 ("PAMF") (Docket No. 70-2).)  While on the freeway during transportation, Gonzalez repeatedly fell off his seat on the bus into the middle aisle and hit his head. (See id.)  After falling and smacking his head for the third time, Gonzalez did not rise from the bus floor and convulsed and seized until he suddenly stopped moving and fell silent. (See Pls.' Resp. to Defs.' SUF at No. 46.)  Plaintiffs state that the other

was in the Court's Control Room when the bus arrived.  (See id. at No. 51.)  He was given notice that Gonzalez was nonresponsive on the bus at around 12:16 P.M.  (See id. at No. 52.)  Upon receiving notice, he immediately ran to the sally port.  (See id. at No. 53.)  From approximately 12:16 P.M. to 12:18 P.M., emergency medical equipment was brought into the sally port and prepped for use on Gonzalez.  (See id. at No. 48.)  At approximately 12:18 P.M., Gonzalez was taken off the bus by law enforcement personnel and Deputy Felber began performing chest compressions on Gonzalez.  (See id. at No. 49.)  He continued to perform chest compressions on Gonzalez until an ambulance with emergency medical personnel arrived at the sally port at approximately 12:22 P.M.  (See id. at No. 50.)

Based on an autopsy conducted by pathologist Dr. Bennet Omalu, Gonzalez suffered from a rare genetic condition associated with sudden cardiac arrest.  (See id. at No. 77.)  Gonzalez never disclosed to the Jail's correctional or medical staff that he had any cardiac disease or abnormality.  (See id. at No. 79.)  Some of the medications given to Gonzalez while in Jail to alleviate his withdrawal symptoms, which are part of the Jail's opiate withdrawal protocol, have also been linked to cardiac arrythmias.  (See id. at No. 80.)  However, not knowing of Gonzalez's cardiac condition, the Jail's medical staff had no reason not to administer the usual protocol medications to Gonzalez.  (See id.)

II.  Motion to Seal

---

inmates on the bus informed Deputy Vince Chunn, the bus driver, and Deputy Hicks that Gonzalez was nonresponsive approximately ten minutes before the bus arrived at the sally port.  (See id. at No. 65.)

1    Defendants request that the court seal Exhibit 19 to
2  their Compendium of Evidence, which consists of video footage of
3  the transport bus arriving from Jail in the sally port of the San
4  Joaquin County Superior Court on June 26, 2018.  (See Defs.' Req.
5  to Seal (Docket No. 67).)

6    A party seeking to seal a judicial record bears the
7  burden of overcoming a strong presumption in favor of public
8  access.  Kamakana v. City & Cnty. of Honolulu, 447 F.3d 1172,
9  1178 (9th Cir. 2006).  The party must "articulate compelling
10 reasons supported by specific factual findings that outweigh the
11 general history of access and the public policies favoring
12 disclosure, such as the public interest in understanding the
13 judicial process."  Id. at 1178-79 (citation omitted).  In ruling
14 on a motion to seal, the court must balance the competing
15 interests of the public and the party seeking to keep records
16 secret.  Id. at 1179.

17    Defendants argue that the video should be sealed for
18 reasons of jail and courthouse security, as "the video shows a
19 critical location pertaining to secure inmate transport to court
20 at the San Joaquin County Superior Court."  (Defs.' Req. to Seal
21 at 2.)  Defendants state that "[i]t has long been recognized that
22 jail security is a very important interest in running a jail."
23 Id. (citing Pell v. Procunier, 417 U.S. 817, 823 (1974)).
24 However, the video plainly shows footage of the San Joaquin
25 County Superior Court's sally port, not the jail.  The footage
26 does not reveal which portion of the courthouse the sally port is
27 located in, or from which street one can gain access to the sally
28 port.  Besides vague and conclusory assertions that allowing

9

1  footage contained in the video to become public would "compromise

2  jail and courthouse security," defendants do not articulate any

3  specific reasons why footage of the inside of the sally port

4  would compromise security.  The court therefore finds that

5  interests in jail and courthouse security do not outweigh the

6  public's interest in disclosure of the video.  See Kamakana, 447

7  F.3d at 1178.

8        Defendants further argue that they have an interest in

9  preventing disclosure of the video based on "law enforcement

10  privilege."  Defendants point out that "[c]ourts have long

11  recognized the 'law enforcement privilege as an interest worthy

12  of protection,' and one designed to 'prevent the disclosure of

13  law enforcement techniques and procedures . . . .'"  (Def.'s Req.

14  to Seal at 3 (quoting United States v. Amodeo, 44 F.3d 141, 147

15  (2d Cir. 1995)).  While defendants characterize the video as one

16  depicting "law enforcement techniques," a more accurate

17  description would be that the video shows a bus arriving,

18  followed by a group of assembled police officers transporting a

19  limp body from the bus to the ground and then performing

20  lifesaving techniques until paramedics arrive.  If anything,

21  these are medical or first-response techniques, not "law

22  enforcement techniques."  The court therefore finds that law

23  enforcement privilege does not dictate sealing the video.  See

24  Kamakana, 447 F.3d at 1178.

25        Accordingly, the court will deny defendants' request to

26  seal Exhibit 19 to their Compendium of Evidence.

27  III.  Evidentiary Objections

28        The court will next address defendants' extensive

10

1  evidentiary objections to plaintiffs' Statement of Additional

2  Material Facts.  (See Defs.' Objections to Pls.' Evid. in Opp'n

3  to Mot. for Summ. J. ("Defs.' Objections") (Docket No. 73-4).)

4       A.   Unsworn Witness Testimony and Interviews

5       As defendants note, the vast majority of the evidence

6  relied on by plaintiffs in their opposition derives from the

7  County's In-Custody Death Protocol Investigation.  (See id. at

8  3.)  Following Gonzalez's death, this protocol investigation was

9  initiated.  (See id.)  As part of this investigation, the County

10 Sheriff's Office conducted 74 interviews of witnesses and other

11 Jail/law enforcement personnel, most of which were summarized by

12 the investigating detectives in the form of "Incident Reports."

13 (See id.)  Defendants challenge plaintiffs' reliance on these

14 witness interviews and summaries on multiple grounds.

15      Defendants first argue that the unsworn witness

16 statements and summaries are inadmissible and cannot be

17 considered in a motion for summary judgment because they do not

18 comply with Federal Rule of Civil Procedure 56(c)(1)(A).  (See

19 id. at 4).  This rule provides that a party asserting that a fact

20 cannot be or is genuinely disputed must support the assertion by

21 "citing to particular parts of materials in the record, including

22 depositions, documents. . . affidavits or declarations. . .

23 admissions, interrogatory or other materials. . ."  Fed. R. Civ.

24 P. 56(c)(1)(A).  Defendants cite to two opinions of magistrate

25 judges in this district in support of their proposition, but no

26 binding authority.  See Sanchez v. Penner, No. CIV S-07-0542 MCE

27 EFB P, 2009 WL 3088331, at *4 (E.D. Cal. Sep. 22, 2009);  Johnson

28 v. Sandy, No. 2:12-cv-02992 JAM AC P, 2015 WL 1894400, * 1 (E.D.

1   Cal. Apr. 24, 2015).

2          Defendants are correct that, generally speaking,
3   evidence presented in the context of a motion for summary
4   judgment must be admissible.  See Fraser v. Goodale, 342 F.3d
5   1032, 1036 (9th Cir. 2003).  But a party opposing a motion for
6   summary judgment seeks a trial, not a verdict, and it stands to
7   reason that if evidence may probably be converted to admissible
8   form for trial, it should not be excluded at summary judgment.
9   See Gonzalez v. Cnty. of Yolo, No: 2-13-cv-01368-KJM-AC, 2015 WL
10  4419025, * 4 (E.D. Cal. Jul. 17, 2015).  At the hearing on this
11  motion, plaintiffs stated that the disputed evidence relied upon
12  will be converted to an admissible form at trial.  Accordingly,
13  the court will overrule this objection.

14         Defendants next contend that these witness statements
15  and interview summaries are hearsay.  (See Defs.' Objections at
16  5.)  However, "[a]t the summary judgment stage, we do not focus
17  on the admissibility of the evidence's form" but on the
18  admissibility of its contents.  See Fraser, 342 F.3d at 1036.  If
19  the contents of a document can be presented in a form that would
20  be admissible at trial, for example, through live testimony by
21  the person who was interviewed or who made the statement, the
22  mere fact that the document itself might be excludable hearsay
23  provides no basis for refusing to consider it on summary
24  judgment.  See id. at 1036-37.  Accordingly, the court overrules
25  defendants' hearsay objections.

26         Defendants next argue that the interview summaries and
27  unsworn witness statements are inadmissible because plaintiffs
28  have failed to lay the proper foundation.  (See Defs.' Objections

1    at 6).   However, the Ninth Circuit has long held that "an
2    objection to admission of evidence on foundational grounds must
3    give the basis for the objection in a timely way to permit the
4    possibility of cure."   Jerden v. Amstutz, 430 F.3d 1231, 1237
5    (9th Cir. 2005).   Defendants' conclusory statement that these
6    documents lack foundation, without providing any explanation as
7    to how the documents lack foundation, falls well short of
8    providing plaintiffs with notice of the specific ground of
9    objection, and consequently, what could be done to cure any
10   defects.   See Sandoval v. Cnty. of San Diego, 985 F.3d 657, 666-
11   67 (9th Cir. 2021).   Accordingly, these objections provide no
12   basis for excluding the evidence.   See id.

13         B.   Improper Legal Conclusions, Speculation, and Opinions

14         Defendants also contend that plaintiffs speculate, make
15   improper legal conclusions, and assert opinions disguised as
16   "facts" in their Statement of Additional Material Facts.   (See
17   Defs.' Objections at 6.)   "[O]bjections to evidence on the ground
18   that it is irrelevant, speculative . . . or that it constitutes
19   an improper legal conclusion are all duplicative of the summary
20   judgment standard itself."   Burch v. Regents of University of
21   California, 433 F.Supp.3d 1110, 1119 (E.D. Cal. 2006).   Because
22   statements based on speculation or improper legal conclusions are
23   not facts, and will not be considered by the court on a motion
24   for summary judgment anyway, the court overrules these objections
25   because they are "simply superfluous in this context."   See id.

26         C.   Facts Not Supported by Evidence and Relevance

27         Defendants finally argue that the court should not
28   consider plaintiffs' additional material facts because they are

13

1  not supported by the evidence.  (See Defs.' Objections at 6-7.)

2  This objection is similarly superfluous and is thus overruled for

3  the same reason -- to the extent that plaintiffs' statements of

4  material fact are unsupported by the evidence, they do not

5  constitute material facts and therefore cannot be used to defeat

6  a motion for summary judgment.

7  IV.  <u>Motion for Summary Judgment</u>[8]

8       Summary judgment is proper "if the movant shows that

9  there is no genuine dispute as to any material fact and the

10  movant is entitled to judgment as a matter of law."  Fed. R. Civ.

11  P. 56(a).  The party moving for summary judgment bears the

12  initial burden of establishing the absence of a genuine issue of

13  material fact and can satisfy this burden by presenting evidence

14  that negates an essential element of the non-moving party's case.

15  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).

16  Alternatively, the movant can demonstrate that the non-moving

17  party cannot provide evidence to support an essential element

18  _____

19       [8]   All parties agree that Defendants Deputy Jason
Rohdenburg and Deputy Chue Vang should be dismissed from this

20  case.  On October 7, 2020, the court granted plaintiffs' motion
for leave to file a fourth amended complaint which would add

21  Sergeant Anthony Goulart as a defendant and dismiss Deputy Vang.
(See Docket No. 57.)  Plaintiffs did not ultimately file a fourth

22  amended complaint, so Deputy Vang was not dismissed as a
defendant.  Although the parties discussed a stipulation which

23  would dismiss Deputies Vang and Rohdenburg, (see Decl. of Gregory
Aker in Supp. of Mot. for Summ. J. at Ex. A ("Aker Decl.")

24  (Docket No. 66-2).), the stipulation was not entered into due to
a disagreement between counsel over legal fees and expenses which

25  resulted in name calling and discourteous language.  (See id.)

26  The court admonishes that such language is unnecessary,
unprofessional and ultimately only hurts the clients that counsel

27  on both sides purport to serve.  Accordingly, the court orders
that Deputies Rohdenburg and Vang be dismissed from this case.

28

14

upon which it will bear the burden of proof at trial.  <u>Id.</u>  If the moving party has properly supported its motion, the burden shifts to the non-moving party to set forth specific facts to show that there is a genuine issue for trial.  <u>See</u> <u>id.</u> at 324.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  Any inferences drawn from the underlying facts must, however, be viewed in the light most favorable to the party opposing the motion.  <u>See</u> <u>id.</u>

### A.    Threshold Element of Causation

As a preliminary matter, defendants argue that plaintiffs' federal claims necessarily fail because there is no material dispute that Gonzalez's underlying health conditions, rather than any actions taken by defendants, caused his death.  (<u>See</u> Mot. for Summ. J. at 13-14.); <u>see</u> <u>Blanco v. Cnty. of Kings</u>, 142 F.Supp.3d 986, 992 (E.D. Cal. 2015).

Defendants rely on several conclusions made by plaintiffs' forensic expert, Dr. Bennet Omalu.  Dr. Omalu concluded that Gonzalez died as a result of sudden cardiac arrhythmogenic death and that cocaine toxicity was a contributory factor. (<u>See</u> Mot. for Summ. J. at Ex. 24, p. 4.)  Dr. Omalu also stated that Gonzalez suffered from a rare genetic condition associated with sudden cardiac arrest.  (<u>See</u> Defs.' SUF at No. 77.)  Gonzalez never disclosed to the Jail's correctional or medical staff that he had any cardiac disease or abnormality, (<u>see</u> <u>id.</u> at No. 79), and did not disclose that he had used cocaine hours before he was arrested.  (<u>See</u> Mot. for Summ. J. at

14.)  Defendants contend that Dr. Omalu's testimony dooms plaintiffs' § 1983 claims because it shows that Gonzalez's death had nothing to do with the conduct of the named individual defendants.  (See id.)[9]

Plaintiffs' expert ultimately comes to a different conclusion than the one offered by defendants, however.  Dr. Omalu states that "[d]eaths from Sudden Cardiac Arrhythmogenic Deaths and/or Cocaine Toxicity are highly preventable and survivable diseases" and that "patients frequently survive if, and when, they are provided timely and definitive medical care." (See Lacy Decl. at Ex. F, p. 5.)  Dr. Omalu also said that the "mechanisms of death of these two causes of death can be readily arrested, reversed, or controlled to reduce the risk of sudden death, especially in a controlled institutional environment." (See id.)  Dr. Omalu opined that "Gonzalez's death was highly preventable if timely and definitive medical care had been provided."  (See id. at 6.)  Although defendants describe Gonzalez's heart as akin to a ticking time bomb, Dr. Omalu stated that Gonzalez was not "in any imminent traumatic danger, and death was not imminent."  (See id. at 5.)

In Sandoval, the Ninth Circuit held that there was a genuine dispute of material fact as to whether there was a direct causal link between the County's practices and the decedent's injuries because the plaintiff's expert opined that the decedent would have survived if he had been taken to the hospital at any

---

[9]     For example, neither party argues that the allegedly excessive use of force used by Deputy Baxter in getting Gonzalez onto the bus directly caused his death.

1   time before he went into cardiac arrest.  See Sandoval, 985 F.3d
2   at 681.  Following the same reasoning, the court finds that Dr.
3   Omalu's testimony suffices to create a genuine issue of material
4   fact as to the cause of Gonzalez's death, and will not grant
5   summary judgment on this basis.

6       B.   Qualified Immunity

7           The doctrine of qualified immunity "protects government
8   officials 'from liability for civil damages insofar as their
9   conduct does not violate clearly established statutory or
10  constitutional rights of which a reasonable person would have
11  known.'"  Pearson v. Callahan, 555 U.S. 223, 231 (2009)(citing
12  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  To determine
13  whether an officer is entitled to qualified immunity, the court
14  considers: (1) whether there has been a violation of a
15  constitutional right; and (2) whether the officers' conduct
16  violated "clearly established" federal law.  See Sharp v. Cnty.
17  of Orange, 871 F.3d 901, 909 (9th Cir. 2016) (citing Kirkpatrick
18  v. Cnty. of Washoe, 843 F.3d 784, 788 (9th Cir. 2016)).  The
19  court has the discretion to decide which prong of qualified
20  immunity to address first and, if analysis of one prong proves
21  dispositive, the court need not analyze the other.  See Pearson,
22  555 U.S. at 236.

23          Qualified immunity is a question of law to be decided
24  by the court.  See Hunter v. Bryant, 502 U.S. 224, 228 (2009).
25  "Because the focus is on whether the officer had fair notice that
26  her conduct was unlawful, reasonableness is judged against the
27  backdrop of the law at the time of the conduct."  Kisela v.
28  Hughes, 138 S. Ct. 1148, 1152 (2018).  Although the Supreme Court

1   has established that the case law does not require a case to be
2   directly on point for a right to be clearly established, existing
3   precedent must have placed the statutory or constitutional
4   question beyond debate.  See White v. Pauly, 137 S. Ct. 548, 551
5   (2017).  In other words, immunity protects all but the plainly
6   incompetent or those who knowingly violate the law.  Id.  The
7   Supreme Court has made clear that clearly established law should
8   not be defined at a high level of generality.  See Kisela, 138 S.
9   Ct. at 1152.  Plaintiffs bear the burden of "proving that the
10  right allegedly violated was clearly established at the time of
11  the official's allegedly impermissible conduct."  Camarillo v.
12  McCarthy, 998 F.2nd 638, 640 (9th Cir. 1993).

13          1. Denial of Medical Care/ Failure to Summon Care
14          Plaintiffs allege that defendants Goeman, Baxter, and
15  Felber violated Gonzalez's rights under the Fourteenth Amendment
16  by failing to summon medical care and provide constitutionally
17  adequate medical care.  (See TAC at ¶¶ 34–39.)  Individuals in
18  state custody have a constitutional right to adequate medical
19  treatment.  See Estelle v. Gamble, 429 U.S. 97, 104–05 (1976).
20  For inmates serving custodial sentences following a criminal
21  conviction, that right is part of the Eighth Amendment's
22  guarantee against cruel and unusual punishment.  See id.
23  However, pretrial detainees have not yet been convicted of a
24  crime and therefore are not subject to punishment by the state.
25  See Sandoval, 985 F.3d at 668.  Accordingly, their rights arise
26  under the Fourteenth Amendment's Due Process Clause.  See id.
27  (citing Bell v. Wolfish, 441 U.S. 520, 535–36 (1979).)
28          Claims for violations of the right to adequate medical

care brought by pretrial detainees against individual defendants under the Fourteenth Amendment must be evaluated under an objective deliberate indifference standard.  See Gordon v. Cnty. of Orange, 888 F.3d 1118, 1124-25 (9th Cir. 2018).  Pretrial detainees alleging that jail officials failed to provide constitutionally adequate medical care must show:

> (1) The defendant made an intentional decision with respect to the conditions under which plaintiff was confined [including a decision with respect to medical treatment];
>
> (2) Those conditions put the plaintiff at substantial risk of suffering serious harm;
>
> (3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved -- making the consequences of the defendant's conduct obvious; and
>
> (4) By not taking such measures, the defendant caused plaintiff's injuries.

Id. at 1125 (9th Cir. 2018).  To satisfy the third element, plaintiffs must show that defendants' actions were "objectively unreasonable," which requires a showing of "more than negligence but less than subjective intent -- something akin to reckless disregard."  Id.

Accordingly, to defeat qualified immunity for defendants, plaintiffs must show that, given the available case law at the time, a reasonable jail official knowing what defendants knew would have understood that his actions, "presented such a substantial risk of harm to [Gonzalez] that the failure to act was unconstitutional."  See Horton by Horton v. City of Santa Maria, 915 F.3d 592, 599 (9th Cir. 2019); Sandoval,

19

1  958 F.3d at 678.

2                 a.   Nurse Goeman

3             Plaintiffs first contend that Nurse Goeman violated

4  clearly established federal law by providing constitutionally

5  inadequate medical care when treating Gonzalez and failing to

6  summon a doctor or nurse practitioner.  (See Opp'n to Mot. for

7  Summ. J. at 12.)(Docket No. 70.)  To defeat qualified immunity

8  for Nurse Goeman, plaintiffs must show that, given the available

9  case law at the time, a reasonable nurse knowing what Nurse

10 Goeman knew would have understood that placing Gonzalez in

11 general population housing and clearing him to attend court on

12 June 26, 2018, "presented such a substantial risk of harm to

13 [Gonzalez] that the failure to act was unconstitutional."  See

14 Horton, 958 F.3d at 678.

15            The strongest case that plaintiffs cite in support of

16 their contention that Nurse Goeman violated clearly established

17 law is Sandoval, 985 F.3d at 670.  In Sandoval, the court held

18 that a jail nurse was not entitled to qualified immunity for

19 failure to provide constitutionally adequate medical care when,

20 after being told by a sheriff's deputy that the inmate was

21 shaking, tired, disoriented, and needed to be looked at more

22 thoroughly, the jail nurse merely administered a duplicative

23 blood sugar test, cleared the inmate for booking, and failed to

24 check in on the inmate at any point for multiple hours.  See id.[10]

25            [10]   Although the decision in Sandoval was published in
26 2021, the incidents at issue in Sandoval occurred in 2014.  See
   id. at 662.  In deciding Sandoval, the Ninth Circuit held that,
27 even in 2014, the law clearly established that the nurses'
   actions presented such a substantial risk of harm to the decedent
28 that the failure to act constituted constitutionally inadequate

1          The court concludes that Sandoval is so wholly

2    factually distinguishable that it could not have placed a

3    reasonable nurse, knowing what Nurse Goeman knew, on notice that

4    her conduct was unlawful.  Nurse Goeman did a full medical intake

5    examination of Gonzalez before clearing him to be in a general

6    population cell, started him on the Jail's opiate withdrawal

7    protocol, and determined that he was "hemodynamically stable and

8    not in acute withdrawal" requiring continuous nursing and medical

9    care.  (See Defs.' SUF at Nos. 17–21.)  Most critically, unlike

10   the inmate in Sandoval, Gonzalez was speaking normally and had a

11   steady gait.  (See id. at No. 17.)  His vital signs were normal,

12   and his physical examination only revealed goose bumps, tremors,

13   and a runny nose.  (See id.)  Although Gonzalez reported having

14   nausea, diarrhea, and cramping, he was promptly provided

15   treatment for these symptoms through the medications on the

16   Jail's Opiate Withdrawal Protocol.  (See id.)  In contrast to the

17   inmate in Sandoval, Gonzalez was provided with meaningful medical

18   treatment, and not merely a cursory and duplicative medical test.

19         Nor does Sandoval provide any support for plaintiffs'

20   contention that Nurse Goeman violated clearly established law and

21   provided constitutionally inadequate medical care by clearing

22   Gonzalez to attend court on June 26th.  When Nurse Goeman

23   evaluated Gonzalez on June 26, 2018, he was alert, oriented, and

24   able to communicate his needs and concerns, and he had a strong

25   and steady gait.  (See id. at No. 24.)  He reported that his

26   nausea and vomiting had abated after he had been treated by

27

28   medical treatment.  See id. at 681.

1  another nurse the day prior and did not report any problems

2  eating.  (See id.)

3       Gonzalez's sole complaint at that time was that his

4  hand was cramping and hurt, and Nurse Goeman provided him Motrin

5  for the pain in response.  (See id.)  Nurse Goeman asked Gonzalez

6  whether he wanted to be on bed rest, and he stated that he did

7  not and wished to go to his court appearance.  (See Mot. for

8  Summ. J. at Ex. 5.)  Accordingly, Nurse Goeman cleared him to

9  return to his general population housing unit and to go to court

10  the next day.  (See id.)  Unlike the inmate in Sandoval, Gonzalez

11  was alert, oriented, able to communicate his needs and concerns,

12  and was not only provided medical treatment but was actually

13  improving because of the medical treatment provided.  Sandoval

14  could not have possibly placed Nurse Goeman on notice that she

15  was providing constitutionally inadequate medical care by

16  acceding to Gonzalez's wish to go to court, particularly given

17  his relatively minor symptoms of opiate withdrawal.

18       Although plaintiffs contend that Nurse Goeman was

19  somehow required to summon additional medical help by contacting

20  a doctor or nurse practitioner, the evidence they rely upon does

21  not establish this.  (See Opp'n to Mot. for Summ. J. at 19.)

22  Rather, the County of San Joaquin Standardized Procedures for

23  Narcotic Withdrawals makes clear that symptoms of withdrawal

24  routinely last for 4-6 days, and that a doctor or nurse

25  practitioner need be contacted only if the signs and symptoms are

26  severe or do not improve despite treatment.  (See Lacy Decl. at

27  Ex. C., p.3.)  Although vomiting is listed as a severe subjective

28  sign of withdrawal, (see id. at p.2), Gonzalez had improved after

1  being treated for vomiting and did not report any problems eating
2  when he was evaluated by Nurse Goeman.  (See Defs.' SUF at No.
3  24.)  Nor have plaintiffs provided any information suggesting
4  that a hand cramp is a severe symptom of opiate withdrawal.

5        In any event, Sandoval could not possibly have placed
6  Nurse Goeman on notice that the failure to summon medical care at
7  that stage was a violation of Gonzalez's constitutional rights.
8  In Sandoval, the Ninth Circuit held that jail nurses were not
9  entitled to qualified immunity when the nurses knew that Sandoval
10  was unresponsive and having seizures but failed to promptly
11  summon paramedics, which was "[s]tandard nursing protocol."  See
12  Sandoval, 985 F.2d 657, 679.  In contrast to Sandoval, Nurse
13  Goeman was not confronted with an inmate who was unresponsive and
14  in acute medical need.  Nor is there any evidence that Goeman was
15  required to contact a doctor or nurse practitioner about
16  Gonzalez's symptoms, particularly since he was improving with
17  treatment.  All in all, Sandoval could not have placed a
18  reasonable nurse, knowing what Nurse Goeman knew, on notice that
19  her conduct was in any way unlawful.

20              b.  Deputy Baxter

21        Plaintiffs next contend that Deputy Baxter violated
22  clearly established federal law by failing to summon medical care
23  for Gonzalez. (See Opp'n to Mot. for Summ. J. at 19.)  Plaintiffs
24  cite Sandoval for the proposition that failure to provide "life
25  saving measures to an inmate in obvious need" is a clear
26  constitutional violation.  See Sandoval, 985 F.3d at 679-80.  The
27  court must therefore analyze whether Sandoval would have placed a
28  reasonable deputy, knowing what Deputy Baxter knew at the time,

1   on notice that failing to summon medical care for Gonzalez and

2   ensuring that he boarded the bus to his court date presented such

3   a substantial risk of harm to Gonzalez that the failure to act

4   was unconstitutional.  See Horton, 915 F.3d 592, 599 (9th Cir.

5   2019).

6          California Penal Code § 825 mandates that criminal

7   defendants be taken before a criminal court judge without delay,

8   and in any event, within 48 hours of the arrest excluding Sundays

9   and holidays.  See Cal. Pen. Code § 825.  Although Gonzalez made

10  complaints of medical distress, requesting to see a nurse,

11  moaning that he was in pain, and even saying he was dying, Deputy

12  Baxter determined that Gonzalez should be sent to his mandated

13  court date only after verifying that he had been medically

14  cleared to attend court mere hours earlier, had refused bed rest,

15  and had insisted to Nurse Goeman that he wished to attend his

16  court date.  (See id. at No. 36.)

17         Moreover, the Supreme Court has held that "clearly

18  established federal law does not prohibit a reasonable officer .

19  . . from assuming that proper procedures . . . have already been

20  followed."  See White, 137 S. Ct. at 552.  Deputy Baxter was

21  therefore entitled to assume that proper medical procedures,

22  including Nurse Goeman's medical clearance of Gonzalez mere hours

23  earlier, had been followed.  The court therefore concludes that

24  Sandoval could not have placed a reasonable deputy, knowing what

25  Deputy Baxter knew, on notice that his conduct here was unlawful.

26                    c.   Deputy Felber

27         Plaintiffs finally contend that Deputy Felber violated

28  clearly established federal law and failed to summon medical care

under 42 U.S.C. § 1983.  The court must therefore determine whether Sandoval would place a reasonable deputy, knowing what Deputy Felber knew at the time, on notice that failing to have an ambulance waiting for Gonzalez and additional deputies at the ready, presented such a substantial risk of harm to Gonzalez that the failure to act was unconstitutional.  See Horton, 915 F.3d at 600.

Plaintiffs cite Sandoval for the proposition that "a prison official who is aware that an inmate is suffering from a serious acute medical condition violates the Constitution when he stands idly by rather than responding with reasonable diligence to treat the condition." Sandoval, 985 F.3d at 680.  However, Deputy Felber only knew that Gonzalez complained of a medical problem, not a medical emergency or serious acute medical condition, and Deputy Baxter's statements indicated that the main issue with Gonzalez was that he was being uncooperative.  (See Mot. for Summ. J. at Ex. 20, Dep. Tr. of Matthew Felber at 24:3-8; Defs.' SUF No. 41.)

No evidence suggests that Deputy Felber became aware that Gonzalez would require lifesaving, or even immediate, medical attention until after Gonzalez had already arrived at the courthouse.  Nor is it clear to the court that Deputy Felber even had the authority to summon additional medical care or order more deputies to respond to Gonzalez's transport bus; rather, the evidence suggests that the ultimate decisions were to be made by Deputy Felber's superior, Sergeant Wheelen.  All in all, Sandoval could not have placed a reasonable deputy, knowing what Deputy Felber knew, on notice that his conduct under the circumstances

1    of this case was unlawful.

2                    d.   <u>Conclusion</u>

3          Because plaintiffs fail to identify sufficiently

4    specific constitutional precedents to alert defendants that their

5    particular conduct was unlawful, all defendants are entitled to

6    qualified immunity for the alleged failure to provide

7    constitutionally adequate medical care and failure to summon

8    medical care under 42 U.S.C. § 1983.  Considering all the

9    evidence, in the light most favorable to plaintiffs, the court

10   cannot conclude that any of these defendants either knowingly

11   violated the law or were plainly incompetent.  See White, 137 S.

12   Ct. at 551.  Accordingly, the court will grant summary judgment

13   on this claim.

14                    2. Loss of Right to Familial Relations

15         Plaintiffs also contend that their own Fourteenth

16   Amendment rights to familial association were violated "as a

17   result of the denial of medical care by defendants."  (See TAC at

18   ¶¶ 52-54.)  Parents and children may assert claims for

19   deprivation of their right to familial association under the

20   Fourteenth Amendment if they are deprived of their liberty

21   interest in the companionship and society of their child or

22   parent through official conduct.  Wilkinson v. Torres, 610 F.3d

23   546, 554 (9th Cir. 2010).

24         However, liability for loss of familial relations is

25   limited to official conduct that "shocks the conscience."  Porter

26   v. Osborn, 546 F.3d 1131, 1137 (9th Cir. 2008).  The Ninth

27   Circuit has indicated that this standard may be satisfied by

28   conduct that either "consciously or through complete indifference

                                   26

1  disregards the risk of an unjustified deprivation of liberty."

2  Tatum v. Moody, 768 F.3d 806, 820-21 (9th Cir. 2014) (citation

3  omitted).  The Ninth Circuit further held that:

4           [W]here actual deliberation is practical,
             then an officer's 'deliberate indifference'
5           may suffice to shock the conscience. On the
             other hand, where a law enforcement officer
6           makes a snap judgment because of an
             escalating situation, his conduct may only be
7           found to shock the conscience if he acts with
             a purpose to harm unrelated to legitimate law
8           enforcement objectives.

9  Id. (quoting Gantt v. City of Los Angeles, 717 F.3d 702, 707 (9th

10  Cir. 2013)).

11       The Supreme Court has specifically noted that the

12  "custodial situation of prison" is a setting where deliberate

13  indifference may be sufficient to shock the conscience because

14  "actual deliberation is practical."  Cnty. of Sacramento v.

15  Lewis, 523 U.S. 833, 852 (1998).  This is because, unlike a

16  situation like a high-speed car chase or a prison riot, prison

17  officials have "time to make unhurried judgments" along with "the

18  chance for repeated reflection," and their decision-making is

19  "largely uncomplicated by the pulls of competing obligations."

20  Id. at 853.  Accordingly, "[w]hen such extended opportunities to

21  do better are teamed with protracted failure even to care,

22  indifference is truly shocking."  Id.[11]

23  _____

24       [11]  There is a legitimate question as to whether the proper
     focus of the court's inquiry should be on the constitutional
25  rights of the plaintiffs or Gonzalez.  For instance, plaintiffs
     have proffered no evidence that the defendants knew that Gonzalez
26  had any family, and were therefore aware that by taking any
     allegedly unconstitutional action towards Gonzalez, they might
27  also be liable for violating the substantive due process rights
     to familial association for his family members.  Nevertheless,
28  the court will give plaintiffs the benefit of the doubt and

1    Because the events at issue in this case all took place

2    in a custodial setting where actual deliberation is practical,

3    the determination as to as to whether defendants' actions shocked

4    the conscience is judged by the deliberate indifference standard.

5    See Gordon, 888 F.3d 1118, 1124-25 (holding that claims for

6    violations of the right to adequate medical care brought by

7    pretrial detainees against individual defendants under the

8    Fourteenth Amendment must be evaluated under an objective

9    deliberate indifference standard).

10   The court has already found, above, that defendants are

11   entitled to qualified immunity on plaintiffs' claim for denial of

12   medical care and failure to summon medical care because there is

13   no clearly established law that would have warned defendants that

14   their actions "presented such a substantial risk of harm to

15   [Gonzalez] that the failure to act was unconstitutional."

16   Horton, 915 F.3d at 600-602; Sandoval, 985 F.3d at 678.

17   Accordingly, for the same reasons, defendants are also entitled

18   to qualified immunity with respect to plaintiffs' denial of

19   familial association claim.   See Estate of Nunez by and through

20   Nunez v. Cnty. of San Diego, Case No. 3:16-cv-01412-BEN-MDD, 2018

21   WL 5817091 * 10 (S.D. Cal. Nov. 5, 2018) (holding that because

22   plaintiffs' Fourteenth Amendment right to familial association

23

24   assume that the proper focus of the court's inquiry is on the
     constitutional rights of Gonzalez.   See Porter, 536 F.3d at 1140

25   (holding that where plaintiffs brought a Fourteenth Amendment
     right to familial association claim following defendant's

26   allegedly excessive use of force which killed their son, the
     qualified immunity inquiry turned on whether plaintiffs could

27   present facts that would justify a jury finding that defendant
     acted with an unconstitutional purpose to harm the rights of

28   decedent).

1  with the decedent was necessarily premised on a finding that

2  defendants were deliberately indifferent as to decedent's

3  Fourteenth Amendment right to constitutionally adequate medical

4  care, plaintiffs' Fourteenth Amendment claim could not survive

5  where deliberate indifference to decedent's right to adequate

6  medical care was not established).  The court will therefore

7  grant summary judgment on this claim.[12]

8              3. Excessive Force under 42 U.S.C. § 1983

9             Plaintiffs contend that defendants violated clearly

10  established law in using excessive force under 42 U.S.C. § 1983

11  by making Gonzalez board the bus to court.  Although plaintiffs

12  brought their excessive force claim against all defendants, they

13  now seem to concede that Deputy Baxter is the only individual

14  defendant who used any amount of force on Gonzalez at all.  (See

15  Mot. for Summ. J. at 27-28); (see Opp'n to Mot. for Summ. J. at

16  23-24.)  Accordingly, the court will grant summary judgment as to

17  Nurse Goeman and Deputy Felber and will only evaluate whether the

18

19         [12]   The cases cited by plaintiffs in support of their
   contention that defendants violated clearly established law and
   their Fourteenth Amendment right to familial association do not

20  compel a different finding.  The only Ninth Circuit case cited by
   plaintiffs that addresses the substantive due process right to
   familial association under the Fourteenth Amendment in the

21
   context of deliberate indifference to medical needs is Lemire v.

22  California Department of Corrections and Rehabilitation, 726 F.3d
   1062, 1085 (9th Cir. 2013).  There, the Ninth Circuit did not

23  hold that the actions of defendants who allegedly failed to
   provide CPR to an inmate constituted deliberate indifference or

24  rose to the conscience-shocking level required for a Fourteenth
   Amendment substantive due process violation, but rather found

25  that there were disputed issues of fact which precluded summary
   judgment.  See id. at 1085.  As such, Lemire could not have

26
   placed defendants on notice that their actions were in any way

27  unlawful.

28

1    use of force exerted by Deputy Baxter violated clearly

2    established law.

3           Plaintiffs cite Kingsley v. Hendrickson, 576 U.S. 389,

4    397 (2015), in support of their contention that Deputy Baxter

5    used excessive force and violated clearly established law.  The

6    facts of Kingsley are wholly distinguishable from the facts at

7    issue here.  In Kingsley, an inmate who refused to comply with

8    the orders of jail officials was forcibly removed from his cell

9    while in handcuffs and subsequently kneed in the back, had his

10   head slammed into a concrete bunk, and was stunned with a Taser.

11   See Kingsley, 576 U.S. at 393.  Here, in contrast, Deputy Baxter

12   stated that Gonzalez refused orders to board the bus to court and

13   was "carried" onto the bus.  (See Lacy Decl. at Ex. Z.)

14   Defendants have explained that "carrying" in jail parlance means

15   that Gonzalez was merely escorted onto the bus, not physically

16   picked up.  (See Defs.' SUF No. 39.)  Deputy Baxter also pulled

17   Gonzalez's hand away from the bus's handrail because Gonzalez was

18   actively resisting the deputies and attempting to pull himself

19   off the bus and away from the deputies.  (See id. at No. 38.)

20          Even assuming that Gonzalez was physically carried or

21   thrown onto the bus,[13] plaintiffs have not identified any case law

22   which clearly establishes that such force is excessive in the

23

24          [13]   Plaintiffs contend that Gonzalez was thrown onto the
     bus and that he hit his head.  (See PAMF at No. 36.)  The inmate
25   reports that plaintiffs rely on do not make it clear if this
     means that Gonzalez was literally thrown onto the bus or if the
26   inmate was just speaking figuratively.  It is unclear how the
     deputies could have thrown Gonzalez onto the bus since it is
27   undisputed that the stairs onto the bus are narrow and neither
     deputy ever went onto the bus. (See Defs.' SUF at No. 40.)

28
                                  30

case of a non-compliant inmate who has been medically cleared for court and is actively resisting the deputies attempting to place him on the bus to court.  In sum, <u>Kingsley</u> could not have placed a reasonable deputy, knowing what Deputy Baxter knew, on notice that escorting Gonzalez to the bus and pulling his hand away from the bus's handrail, while Gonzalez was actively resisting the deputies and attempting to pull himself off the bus, would amount to a constitutional violation.

Because plaintiffs have failed to identify sufficiently specific constitutional precedents to alert Deputy Baxter that his particular conduct was unlawful, Deputy Baxter is entitled to qualified immunity for the alleged unreasonable use of force. Considering all the evidence in the light most favorable to plaintiffs, the court cannot conclude that Deputy Baxter either knowingly violated the law or was plainly incompetent. <u>See</u> <u>White</u>, 137 S. Ct. at 551.  Accordingly, the court will grant summary judgment on this claim.

     C.   <u>State Law Claims</u>

Because the court will grant summary judgment on plaintiffs' federal claims, the court no longer has federal question jurisdiction, and there is no suggestion that there is diversity jurisdiction in this case.  Federal courts have "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a). But a district court "may decline to exercise supplemental jurisdiction. . . [if] the district court has dismissed all

31

1  claims over which it has original jurisdiction."  28 U.S.C. §

2  1367(c); see also Acri v. Varian Assocs., Inc., 114 F.3d 999,

3  10001 n.3 (9th Cir. 1997)(en banc) (explaining that a district

4  court may decide sua sponte to decline to exercise supplemental

5  jurisdiction).

6       The Supreme Court has stated that "in the usual case in

7  which all federal-law claims are eliminated before trial, the

8  balance of factors to be considered under the pendent

9  jurisdiction doctrine -- judicial economy, convenience, fairness

10  and comity -- will point toward declining to exercise

11  jurisdiction over the remaining state-law claims." Carnegie-

12  Mellon Univ. v. Cohill, 488 U.S. 343, 350 n.7 (1988).

13       Here, comity strongly weighs in favor of declining to

14  exercise supplemental jurisdiction over plaintiffs' state law

15  claims.  The state courts are fully competent to adjudicate such

16  claims.  Some of plaintiffs' claims raise particularly complex

17  questions of state law.[14]  Such questions are better left to

18

19  ──────────────────
       [14]   The court heard additional arguments from the parties
    about plaintiffs' claim under the Tom Bane Civil Rights Act.

20  These arguments revealed a split among district courts in
    California, and even within this very district, as to whether

21  claims under the Tom Bane Civil Rights Act can be brought as
    survival actions.  The arguments also revealed substantial

22  confusion as to whether threats, intimidation, and coercion must
    be shown independently from the alleged constitutional violation

23  in a deliberate indifference to medical needs claim.  The
    intricacies of the Tom Bane Civil Rights Act are particularly

24  salient in this case because, as plaintiffs' counsel conceded
    during the additional argument, Gonzalez died without incurring

25  any general damages.  It is therefore an open question of state
    law as to what damages plaintiffs would be entitled to recover if

26  they prevail on their Tom Bane Act claim.  After hearing the
    parties' arguments and conducting its own legal research, the

27  court is convinced that this is a uniquely complex and unsettled
    area of state law and the specific Tom Bane Act claim in this

28

1  California courts to resolve.

2          As for judicial economy, plaintiffs' state law claims

3  have not been the subject of any significant litigation in this

4  case, as the parties have focused on the federal claims.

5  Judicial economy does not weigh in favor of exercising

6  supplemental jurisdiction.  And finally, convenience and fairness

7  do not weigh in favor of exercising supplemental jurisdiction

8  over plaintiffs' remaining state law claims.  The federal and

9  state fora are equally convenient for the parties.  There is no

10  reason to doubt that the state court will provide an equally fair

11  adjudication of the issues.  There is nothing to prevent

12  plaintiffs from refiling their state law claims against the

13  remaining defendants in state court, and any additional cost or

14  delay resulting therefrom should be minimal.[15]  Accordingly, the

15  court declines to exercise supplemental jurisdiction and will

16  dismiss plaintiffs' remaining state law claims without prejudice

17  to refiling in state court.

18          IT IS THEREFORE ORDERED that that defendants' motion to

19  seal, (Docket No. 67), be, and the same hereby is DENIED;

20          IT IS FURTHER ORDERED that, pursuant to the

21  representations of all parties, all claims against defendants

22

23  case would be best decided by state courts.

24      [15]  "[T]he period of limitations for any claim asserted
    under [28 U.S.C. § 1367(a)], and for any other claim in the same
25  action that is voluntarily dismissed at the same time or after
    the dismissal of the claim under subsection (a), shall be tolled
26  while the claim is pending and for a period of 30 days after it
    is dismissed unless State law provides for a longer tolling
27  period."  28 U.S.C. § 1367(d).

28

1   Chue Vang and Jason Rohdenburg be, and the same hereby are,

2   DISMISSED WITH PREJUDICE;

3          IT IS FURTHER ORDERED that defendants' motion for

4   summary judgment (Docket No. 66-1) be, and the same hereby is,

5   GRANTED as to plaintiffs' first claim for denial of medical

6   care/failure to summon medical care under 42 U.S.C. § 1983, third

7   claim for excessive force under 42 U.S.C. § 1983, and fourth

8   claim for loss of their right to familial association under 42

9   U.S.C. § 1983;

10          AND IT IS FURTHER ORDERED that plaintiffs' remaining

11  claims against defendants under California law be, and the same

12  hereby are, DISMISSED WITHOUT PREJUDICE to refiling in state

13  court.

14          The Clerk of Court is instructed to enter judgment

15  accordingly.

16  Dated:  April 20, 2021

17

18  WILLIAM B. SHUBB

19  UNITED STATES DISTRICT JUDGE

20

21

22

23

24

25

26

27

28

34